DECLARATION OF DIANE SPREADBURY
PURSUANT TO 28 U.S.C. 1746

I, Diane Spreadbury, hereby make the following declaration based upon my personal knowledge:

I.

1. I am employed as a Manager in the Compliance Department of the National Futures Association ("NFA"). My primary responsibilities include oversight of audits, financial surveillance and investigations of NFA Member firms.

2. NFA's responsibility is to safeguard market integrity and protect the public interest through the screening, registration, and regulation of all firms and individuals who want to conduct futures-related business with the public. NFA is a registered futures association under Section 17 of the Commodity Exchange Act. 7 U.S.C. §21.

3. My duties as a Compliance Manager include the supervision of field audit teams that review the books and records of NFA members.

4. In my capacity as Manager, I led the team that is conducting an audit of Raleigh Capital Management Inc. ("RCM") and Richard H. Hamilton, Jr. ("Hamilton").

5. RCM is registered with the Commodity Futures Trading Commission (the "Commission") as a commodity pool operator ("CPO") and is a Member of NFA that lists its main office as being located in Morocco. Exhibit 1. RCM has been registered as a CPO since August 1986. Hamilton is the sole owner and principal of RCM and is registered with the Commission as an associated person ("AP") of RCM and is an NFA Associate Member. Exhibit 2.

6. RCM operates the Raleigh Fund, L.P. (the "Fund") and has filed an exemption for the Fund pursuant to the Commission's Regulation 4.7.

7. The Fund has approximately twenty-eight investors, including Hamilton and several of his family members.

8. As a result of NFA's investigation discussed below, NFA, on July 23, 2009, issued a Member Responsibility Action and an Associate Responsibility Action against RCM and Hamilton, respectively. Exhibit 3. Among other things, these actions prohibited RCM and Hamilton from entering into any

transactions on behalf of the Fund and prohibited RCM and Hamilton from disbursing or transferring any funds from any accounts in the name of RCM or the Fund without prior approval from NFA.

## II.  Initiation of the Audit

9.  In May 2009, NFA was contacted by a participant in the Fund who represented to NFA that Hamilton was not honoring full redemption requests.

10. During this same time period, NFA received the unaudited Annual Report for the Fund for the years ending December 31, 2007 and 2008 (the "Annual Report"). Exhibit 4. Hamilton signed this Annual Report. NFA's review of the Annual Report revealed a "receivable balance" from Hamilton of almost $790,000. According to the Annual Report, interest on this amount is accrued monthly and paid by Hamilton at a rate of 1% per annum. Exhibit 4, page 9.

11. The Annual Report further indicated that $2.1 million of the Fund's assets were pledged to RBC Centura Bank ("RBC") in connection with a loan by RBC to Little Creek Ventures, LLC ("Little Creek Ventures"). According to the Annual Report, the Fund pledged the assets to RBC to guarantee a portion of the loan and in exchange received a one-third interest in Little Creek Ventures. Exhibit 4, page 8.

12. Based on the representation from the participant as well as the unusual items listed in the Fund's Annual Report, NFA began an audit of RCM and Hamilton on June 2, 2009.

## III.  The Hamilton Note

13. The Fund's Annual Report reported a "receivable balance" from Hamilton of almost $790,000. According to the Annual Report, interest on this amount is accrued monthly and paid by Hamilton at a rate of 1% per annum. Exhibit 4, page 9.

14. Hamilton represented to NFA that the receivable balance noted in the Annual Report was the total of several loans from the Fund to Hamilton. Specifically, since at least 2000, Hamilton has taken loans of varying amounts from the Fund. As of April 30, 2009, the amount that Hamilton owes the Fund was in excess of $790,000.

15. Hamilton represented that he had borrowed the money from the Fund to

purchase shares for himself in the Fund. Hamilton represented that these loans were permissible under the Confidential Private Placement Memorandum ("PPM") for the Fund. Exhibit 5. NFA's review of the PPM revealed that the Fund's assets may be loaned to, among others, Hamilton. Exhibit 5, page 9 (page 13 of the PDF). The PPM further provides that in the event of such a loan to Hamilton "the proceeds of such loan will be reinvested in the Partnership" so that Hamilton will "participate in [the Fund] as a Limited Partner." The PPM also provides that Hamilton "will pay interest to the Partnership at a competitive rate." The Annual Report indicated that interest was being accrued monthly and Hamilton was paying interest at the rate of 1%.

16. Based upon the documents provided by RCM, including bank and brokerage statements for the Fund, however, Hamilton has not paid any interest to the Fund since July 2008. Moreover, it does not appear that Hamilton has provided any notice to participants regarding his failure to pay interest.

17. Exhibit 6 is a summary of the payments made to Hamilton by the Fund for loans for reinvestment in the Fund. Exhibit 6 also includes Hamilton's payments to the Fund for principal and interest on a monthly basis from January 2000 to April 2009.

18. Of the approximately $790,000 currently owed by Hamilton to the Fund, $275,000 was transferred from the Fund to Hamilton between May and August 2004. Exhibit 6, page 1-2. Based on the records provided by RCM and Hamilton, however, it does not appear that these loans were used to purchase shares in the Fund, which is what Hamilton had claimed the loans were used for and would be consistent with the PPM's terms.

19. NFA asked Hamilton to explain the $275,000 that was transferred to him from the Fund between May and August 2004. In response, Hamilton sent an e-mail to NFA in which he described the transfers as "bizarre." Exhibit 7. He stated, however, that he did "recall vaguely my debt to the Fund had mysteriously ballooned" and that he had been intending to have RCM's accountant look into it. Hamilton further stated that he was unable to recall why he had transferred the money saying that to do so was "simply ridiculous," that he was "aghast" and that the transfers were "inexplicable." In his e-mail, Hamilton also represented that if the transfers did occur they were "inadvertent."

20. These transfers did, in fact, occur, but Hamilton has failed to provide a coherent explanation for them. Attached as Exhibits 8 through 11 are copies of bank statements for the Fund's bank account between May 2004 and August 2004 reflecting the transfer of money from the Fund to Hamilton.

3

### IV. "Advanced Management Fees"

21. In addition to the loans to Hamilton, the Annual Report also revealed that RCM owed the Fund $292,868 for "an advance of fees" as of December 31, 2008. Exhibit 4, page 9. Bank records indicate that RCM also received a payment of $10,000 as an advance of fees on February 22, 2009. Exhibit 12 is a compilation of payments to RCM from the Fund between January 2005 and April 30, 2009.

22. NFA reviewed the terms of the PPM and the Fund's Limited Partnership Agreement ("LPA"). Exhibit 13. Neither of these documents provide for the advancement of fees. Instead, management fees are to be paid in arrears the month following the end of the month to which the fee relates. Exhibit 13, page 12 (page 15 of the PDF). Additionally, RCM is obligated to pay all ordinary operating expenses of the Fund. Exhibit 5, page 5 (page 9 of the PDF).

23. Hamilton represented to NFA that he had advanced money from the Fund to RCM to pay for operating expenses. However, NFA's review of the financial records for RCM reveals payments for items that would not appear to be Fund operating expenses. For example, from at least 2005, there are monthly payments to BMW and Harley Davidson and payments to plane charter services and other entities that appear unrelated to the Fund's operating expenses. Exhibits 14-17 are copies of RCM bank statements and internal records showing payments for these expenses occurring in the same months as the "advances" on fees were made from the Fund to RCM.

24. NFA also found that during the same period that Hamilton was taking "advances" of management fees; the Fund paid more than $750,000 in management and incentive fees to RCM.

### V. Real Estate Transactions

25. In addition to the loans, Hamilton also transferred $430,000 to himself from the Fund that he represented was for three pieces of real estate he had sold to the Fund. Exhibit 7.

26. According to Hamilton, in June 2009 Hamilton transferred to himself approximately $430,000 from the Fund. Hamilton represented to NFA that of these payments $140,000 and $170,000 were for two condominiums that he individually owned and claimed he had sold to the Fund. Exhibit 18.

27. Hamilton provided NFA with real estate contracts and warranty deeds for

4

the sale of the two condominiums, which were signed by Hamilton. Exhibits 19 to 22 are the sales contracts and warranty deeds submitted to the NFA by Hamilton.

28. NFA has not received any other documents to support that these sales were actually completed. Additionally, a review of the web site for the Cook County Recorder of Deeds reveals that the deeds transferring these properties to the Fund do not appear to have been recorded.

29. In addition to the condominiums, Hamilton represented that he sold the Fund his interest in 6641 North Greenview LLC ("NGL"), which owns property at 6641 North Greenview, in Chicago. According to an agreement provided by Hamilton, the Fund paid $120,000 to Hamilton for his interest in NGL. Exhibit 23 is a copy of the sales agreement that Hamilton provided as evidence that he had sold his interest in the property.

30. On October 10, 2009, NFA received an e-mail from which it appears that Hamilton has arranged to sell one of the condominiums he had purportedly sold to the Fund, and for which he has already received $140,000, to another buyer. The e-mail indicates that Hamilton intends to use the proceeds of this sale to pay for his attorney. Exhibit 24.

31. On October 12th, NFA spoke with the attorney representing RCM and Hamilton regarding this e-mail and he represented to NFA that the sales of the condominiums from Hamilton to the Fund had never been completed and, therefore, Hamilton was still the owner and permitted to sell the condominium.

32. The October 10th e-mail also includes information that Hamilton is attempting to sell his interest in NGL to John Davidson, a former AP and principal of RCM, even though he has already received $120,000 from the Fund purportedly for his interest in NGL.

### VI. Redemption Requests and Bank Accounts

33. During its audit, NFA spoke with a second participant in the Fund who also indicated that Hamilton was restricting redemptions from the Fund. This participant provided NFA with an e-mail from Hamilton dated February 25, 2009, in which he wrote that, due to a "'force majeur' situation" he had "decided in late January to restrict redemptions on a temporary basis. . . . This is and has applied to everyone including family members that had wanted to redeem." Exhibit 25.

34. However, in a conversation on June 3, 2009, Hamilton represented to NFA that he had not previously placed any restrictions on redemptions

5

from the Fund.

35. In a letter dated June 24th, Hamilton represented that with regard to the seeming contradiction between his statements and the e-mail he sent to the participant, that he had not suspended redemptions but only limited them "to a level that would not damage the Fund, but also accommodate investors as much as possible." Exhibit 26.

36. On June 19th, NFA requested that Hamilton provide NFA with copies of bank statements from all personal accounts so as to, among other things, determine if he had the wherewithal to repay the amount he owes the Fund. Hamilton provided a statement for a single bank account in Chicago.

37. On July 10th, however, during a conversation with Hamilton, NFA became aware that he had an additional bank account in Morocco. When NFA asked why he had not provided statements for this account or previously disclosed this account to NFA in response to the June 19th request, he responded that he was telling NFA now.

I declare under penalty of perjury that the foregoing is true and correct.
Executed in Chicago, Illinois on October 27 2009.

_____
Diane Spreadbury