IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, ) ) ) ) Plaintiff, ) ) v. ) ) RALEIGH CAPITAL MANAGEMENT, ) INC. and RICHMOND H. HAMILTON, JR. ) ) Defendants. ) ) ) | CIVIL ACTION NO. 09 C 6780  Hon. Charles R. Norgle, Sr. |
| RALEIGH FUND, LP. ) ) Relief Defendant. ) ) | |

**OBJECTION OF RICHMOND HAMILTON, SR. TO THE TEMPORARY RECEIVER'S PROPOSED DISTRIBUTION SCHEME AND PLAN OF INTERIM DISTRIBUTION**

Richmond Hamilton, Sr., ("Hamilton, Sr.") by his attorneys, and for his Objection to the Temporary Receiver's proposed distribution scheme and plan of interim distribution, states as follows:

## BACKGROUND FACTS

1. Richmond Hamilton, Sr. ("Hamilton, Sr.") has been an investor in the Raleigh Fund since its inception in 1987. He is the father of the Defendant, Richmond Hamilton, Jr.

2. On October 28, 2009, Plaintiff filed its Complaint for Injunctive and Other Equitable Relief and Penalties Under the Commodity Exchange Act against Richmond Hamilton, Jr. and Raleigh Capital Management. The Complaint alleged that, since May 2004, the

1

Defendants had misappropriated approximately $1,000,000 from the Raleigh Fund, failed to disclose information concerning the nonpayment of loan interest, and made false statements to the National Futures Association.

3. The Temporary Receiver was appointed on October 29, 2009.

4. On September 10, 2010, the Temporary Receiver filed her Motion to Make Interim Distribution of Funds to Certain Limited Partners and to Bar Any Claim Not Timely Filed. The proposed interim distribution of the funds of the Raleigh Fund is in the aggregate amount of $1,000,000. The Temporary Receiver proposes a distribution scheme which would pay amounts to certain limited partners of the Raleigh Fund and to pay no amount to certain other limited partners of the Raleigh Fund. Hamilton, Sr. is one of the limited partners who is excluded from participation in the proposed interim distribution.

5. The distribution scheme proposed by the Temporary Receiver provides for current payments to any limited partner who has invested more cash to purchase units in the Raleigh Fund than has been received by the limited partner pursuant to redemption of units. No payment is proposed for any limited partner who has received more cash in redemption of units than was paid to acquire units of the Raleigh Fund.

6. The impact of the proposed distribution scheme on Hamilton, Sr. is material. Hamilton, Sr. is the owner of 101.7322 units of limited partnership interest in the Raleigh Fund, which represent ownership of 13.20% of the total of 770.42 issued and outstanding units. The Defendant, Richmond Hamilton, Jr. owns 150.1895 of the issued and outstanding units. Hamilton, Sr. supports the intention of the Temporary Receiver to exclude a Defendant from participation. Therefore, the ownership by Hamilton, Sr. of 101.7322 units represents ownership of 16.40% of the issued and outstanding units (620.2305) subject to participation in the current

distribution of $1,000,000. Nevertheless, the Temporary Receiver proposes that none of the limited partnership assets available for current distribution be allocated to the units owned by Hamilton, Sr. Instead, the Temporary Receiver proposes to make disproportionate distributions to certain unit holders, in violation of the Limited Partnership Agreement governing the participation rights applicable to all the units.

7. As the owner of 16.40 % of the available issued and outstanding units of limited partnership interest of the Raleigh Fund, Hamilton, Sr. is entitled to that percentage of any distribution of the assets of the Raleigh Fund. As such, his participation in the proposed distribution of $1,000,000 would be $ 164,000, which represents no more than his pro rata share based upon ownership interest.

8. The Limited Partnership Agreement of the Raleigh Fund does not provide for the disparate distribution scheme proposed by the Temporary Receiver.

9. The alleged financial harm caused by the misconduct alleged in the CFTC Complaint which initiated this action and the resulting Temporary Receivership, was to the assets of the Raleigh Fund. As such, any reduction in those assets from the alleged misconduct was allocated pro rata to each limited partner. Therefore, it would not be equitable now, for the Temporary Receiver to compound the harm to certain limited partners caused by the underlying misconduct, while reducing those financial consequences for other limited partners. All were equally harmed by the alleged misconduct, and none should be disproportionately benefited in the distribution of the remaining assets.

10. The proposed distribution scheme penalizes any limited partner who exercised his or her rights to redeem units. Those rights were specifically provided for in the Limited Partnership Agreement. The units of Hamilton, Sr. which were redeemed, were redeemed at

net asset value at the time of redemption. For example, at March 31, 2008, a total of $490,000 of units were redeemed. This redemption resulted in an ownership reduction of 57.1926 units, from 213.5189 at the end of February, to 156.3263 at the end of March 2008. The units were redeemed at a NAV of $8,567.55 (57.1926 x 8,567.55 = $490,000). At March 31, 2008, the NAV for each of the 1,046.94 issued and outstanding units of the Raleigh Fund, including the remaining 156.3263 units owned by Hamilton, Sr., was $8,567.55, reflecting aggregate net assets for the Raleigh Fund of $8,969,705 at that time. (Exhibit 1 - Monthly Statements for Hamilton, Sr. - 02/08 and 03/08).

11. The distribution scheme proposed by the Temporary Receiver ignores the fact that Hamilton, Sr. was required to and did report on his personal tax return his proportionate share of the income and expenses of the Raleigh Fund throughout its operating history. Therefore, as the assets of the Raleigh Fund increased as a result of profitable investment activity with the corresponding increase in the Net Asset Value of its units, Hamilton, Sr. reported and paid tax on that increased value.

12. By utilizing only a "cash in/cash out" methodology, the distribution scheme proposed by the Temporary Receiver ignores both the fact of the historic operating results of the Raleigh Fund, and the significant tax implications of that actual investment activity. For example, in 2004, Hamilton, Sr. received a K-1 for his proportionate share of the income and expense items for the Raleigh Fund. As a result, despite the fact that the actual income and increased asset value was retained in the Raleigh Fund and not distributed to limited partners, Hamilton, Sr. reported the following on his personal tax return, as his proportionate share of the retained "pass through" income and expense of the Raleigh Fund.

4

| **Raleigh Fund**<br>**K-1 - Tax Report** | **Personal Tax Return** |
|---|---|
| Income - Interest | 5,523 |
| Income - Ordinary Dividend | 296 |
| Income - Short-Term Capital Gain | 135,477 |
| Income - Short-Term Gain - 1256 Trns. | 37,508 |
| Income - Long-Term Gain - | 45,334 |
| Income - Long-Term Gain - 1256 Trns. | 56,263 |
| Expense - Other Expense (net) | < 11,451> |
| Adjusted Gross Income Items | 268,950 |
| Investment Interest Expense - Itemized | < 14,673> |

The net "pass-through" of income and expense items from Raleigh Fund, constituted 84.5% of the adjusted gross income for Hamilton, Sr. in 2004, and the very substantial majority of his taxable income in that year.

13. For 2006 and 2007, each years of positive investment performance by the Raleigh Fund, Hamilton, Sr. reported the K-1 tax figures as set forth in Exhibit 2. Exhibit 2 also sets out the tax reporting by Hamilton, Sr. for 2008, a year when the Raleigh Fund experienced investment losses.

14. In each year of its operation, the Raleigh Fund provided its limited partners with K-1 reports of "pass-through" income and deductions. In each year, Hamilton, Sr. included the "pass-through" items in his personal tax return.

## ALTERNATIVE DISTRIBUTION SCHEME

15. Hamilton, Sr. respectfully proposes to the Court that the current distribution be made by the Temporary Receiver pro rata based upon ownership percentages of the issued and outstanding limited partnership interests, after exclusion of the ownership interest of the Defendant, Richmond Hamilton, Jr. This methodology would recognize that: (i) there is only a single class of ownership interests; (ii) each unit of interest carries the same rights and

obligations; (iii) each unit was harmed equally by the financial misconduct alleged in the CFTC Complaint; and (iv) the historic investment activity of the Raleigh Fund had tax implications for limited partners. The application of this distribution scheme, and a comparison to the scheme proposed by the Temporary Receiver, is set forth in Exhibit 3 to this Objection.

16. Exhibit 4 to this Objection demonstrates that the limited partners, including Hamilton, Sr., who have been excluded from participation in the distributions proposed by the Temporary Receiver, own a total of 35.80% of the limited partnership units, after exclusion of the units owned by a Defendant. These limited partners would receive no distribution under the methodology proposed by the Temporary Receiver.

17. Exhibit 5 to this Objection demonstrates that ten (10) limited partners owning an aggregate of 27.34% of the limited partnership units, after exclusion of the units owned by a Defendant, would receive an aggregate of $609,347 or 60.9% of the proposed distribution by the Temporary Receiver.

## ARGUMENT

### I. The Provisions of the Limited Partnership Should Govern

There are no allegations in the CFTC Complaint that any limited partner engaged in misconduct. There are no allegations in the CFTC Complaint that the investment activity in the Raleigh Fund was illusory or a sham. There are no allegations in the CFTC Complaint that the Raleigh Fund operated as a "ponzi scheme" whereby the funds of one limited partner were used to redeem units of another. There are no allegations in the CFTC Complaint that support a contention that the Defendants' misconduct caused separate and distinct harm to one set of limited partners as opposed to another set. Indeed, the financial harm alleged by the CFTC was

to the assets of the limited partnership, which misconduct caused pro rata harm to the limited partners based on their ownership of units.

### A. <u>Only One (1) Class of Limited Partnership Units</u>

Each issued and outstanding unit of limited partnership interest is governed by the same set of rights and obligations. Section 2.19 of the Limited Partnership Agreement defines the units of limited partnership interest. While it provides that the "General Partner" may issue limited partnership interests having different rights and obligations, there is no evidence that different classes of interests were issued, or that the units owned collectively by the current limited partners are not identical in terms of those rights and obligations. (See,, Document 6-15 filed on 10/28/09; Limited Partnership Agreement).

### B. <u>Specific Provision of "Redemptions"</u>

Section 3.13.1 of the Limited Partnership Agreement provides expressly that "Each Limited Partner shall have the power to make a withdrawal, in whole or in part, from his Capital Account as of the end of the calendar quarter..., subject to the terms of this Section 3.13.1....". The proposed distribution scheme of the Temporary Receiver penalizes those limited partners who exercised their respective rights of withdrawal, and benefits those limited partners who did not. In effect, the Temporary Receiver, without justification other than to reallocate the assets of the Raleigh Fund, is "clawing back" money from certain limited partners obtained by them through the exercise of a contractual right of withdrawal, and giving that money to others who did not exercise those same contractual rights.

### C. <u>"Distribution" Provisions</u>

The Temporary Receiver proposes to distribute assets of the Limited Partnership. She proposes to do so under a distribution scheme which violates the distribution provisions in the

7

Limited Partnership Agreement. Section 3.14.4 of the Limited Partnership Agreement provides that distributions to limited partnership shall be made in accordance with the "Allocation Formula set forth in Section 3.5." The "Allocation Formula" in Section 3.5 provides that distributions shall be made pro rata to limited partners based on the amount of each limited partner's capital account balance. (See, also, Section 10.2(iv) of the Limited Partnership Agreement). The distribution scheme proposed by the Temporary Receiver is not based on any pro rata scheme which involves the capital accounts of the limited partners as represented by their ownership of units of limited partnership interest, or otherwise.

D. **Application of Illinois Law**

Federal receivers are obligated to manage and operate property under their control "in the same manner that the owner or possessor would be bound to do" under state law. 28 U.S.C. § 959 (b). The partnership agreement provides that the parties are to share in the distribution pro-rata. "The duties and obligations of partners arising from a partnership relation are regulated by the express contract as far as they are covered thereby." Pav-Saver Corp. v. Vasso Corporation, 143 Ill. App. 3d 1013, 493 N.E.2d 423, 430 (3rd Dist 1986)(Stouder, concurring in part-dissenting in part). Accord, Galesburg Clinic Association v. West, 302 Ill. App.3d 1016, 706 N.E.2d 1035, 1036 (3rd Dist. 1999)("A partnership is a contractual relationship governed by the articles of agreement."). Obviously, the Receivers duties are not met by conveying Hamilton Sr.'s property to other limited partners in contravention of the governing agreement, simply because Hamilton Sr. previously exercised is rights of redemption under that agreement.

Beacon Associates Management Corp. v. Beacon Associates LLC, 09 Civ. 6910, 2010 WL 2947076 at p. 10 (S.D.N.Y. July 27, 2010) held that in determining how assets should be

distributed, "[t]he court is not aware of any legal authority that would allow it to upset this contract between and among Beacon's members and is unpersuaded that equity demands it." [1]

Moreover, equity owners must own equity at the time of the transaction of which they complain and during the pendency of the court suit in order to have standing to maintain their claims. Weil v. Northwest Industries, Inc., 168 Ill. App.3d 1, 522 N.E.2d 172 (1st Dist. 1988). Upon the sale equity, the owner loses his right to pursue or maintain an action based on the ownership interest which was sold. Id. Correspondingly, limited partners who have redeemed units cannot be divested of their rights under the limited partnership agreement with respect to units currently owned, simply because they have redeemed previously owned units. Such a result would run counter to the holding of Weil.

## II. The Methodology Proposed By the Temporary Receiver is Inequitable

The Temporary Receiver is an officer of the Court, and "is appointed on behalf of all parties, and not of the complainant or defendant only....It is the court itself which has the care of the property in dispute." Holland v. Sterling Enterprises, Inc., 777 F. 2d 1288, 1291 (7th Cir. 1985). While the Court possesses discretion with respect to its care of the property, when confronted with the Temporary Receiver's proposal, the Court should exercise its discretion only if the proposal is sensible in its classification of some claims for distribution but not others. SEC v. Enterprise Trust Co., 559 F.3d 649, 652 (7th Cir. 2009) (The Court possesses "discretion to classify claims sensibly in receivership proceedings."). Naturally, in exercising the equitable

---

[1] This cased involved an investment fund which had invested with Madoff. The Magistrate Judge rejected the contention that the "net investment" methodology should be employed because the investment fund (as opposed to Madoff) was not a "ponzi scheme," it was contrary to the operating agreement, and it would deprive the fund investors of the allocation of legitimate profits made by the fund outside of Madoff (at p. 12). The Temporary Receiver's methodology would also deprive the limited partners of the application of the indisputable, entirely legitimate investment profits of the Raleigh Fund.

9

discretion, "equity follows the law and, when the law determines the rights of the respective parties, a court in equity is without power to decree relief which the law denies." In re United Airlines, Inc., 438 F.3d 720, 737 (7th Cir. 2006). Here, the Temporary Receiver requests that the Court ignore the contract among the limited partners, and does so where there are no substantial facts to justify doing so. Moreover, the Court cannot take property from one person and distribute it to another. See infra. at Section IV.

The scheme proposed by the Temporary Receiver is not equitably sensible. It is a scheme applicable perhaps to a circumstance where the entity operated as a "ponzi scheme" or where reported profits were "sham" or "illusory." Neither is the case here, as the CFTC Complaint makes clear. The Raleigh Fund operated for years. Its financial statements at 12/31/04 were audited by the recognized accounting firm of Altschuler, Melvoin and Glasser, LLP. (See, Exhibit 6, Audited Financial Statements). At that time, it had net assets of $12,389,345 represented by "cash" ($2,258,843), "unrealized net trading gains on open futures contracts" of $5,502,451 in accounts at recognized, independent entities, and a receivable due it from its redemption of partnership investments in other funds of $6,274,567. The accounting firm rendered the following opinion on the financial statements:

> "We conducted our audit in accordance with U.S. generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement....In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Raleigh Fund, as of December 31, 2004, and the results of its operations, changes in net assets and cash flow for the year then ended in conformity with the U.S. generally accepted accounting principles."[2]

---

[2] See also, the unaudited financial statements at 12/31/07 and 12/31/08 filed by the CFTC on October 28, 2009 as Document # 6-6.

While the proposal by the Temporary Receiver ignores entirely these audited statements and the profitable investment activity of the Raleigh Fund, the limited partners were required to recognize that historic activity on their personal tax returns. In 2004, Hamilton, Sr. reported income of 268,950 of net income from the Raleigh Fund, which represented the great majority of his taxable income for the year. The limited partners paid tax on "pass-through" income which they did not receive, but which increased their capital accounts and the net asset value of their units. Therefore, when Hamilton, Sr., redeemed units, the amount he received was a factor of the increased net asset value resulting from historic profits which had been retained in the Raleigh Fund, but which he had been required to report on his personal tax return and pay the resulting tax obligation.[3]

The distribution scheme proposed by the Temporary Receiver assumes that the Raleigh Fund had no legitimate operating history. It relies solely upon a calculation of how much cash a limited partner invested - without regard to any cash required for tax payments - , and how much cash the limited partner got back. The proposed scheme is based on a fictitious set of facts and assumptions. As such it cannot be a "sensible classification" of claims, or an equitable one.

---

[3] An example demonstrates the tax implications. On 01/01/04, $1,000,000 was invested by X in a newly-formed Fund A to acquire 1000 unit. Upon acquisition, each unit had a Net Asset Value (NAV) of $1,000. During 2004, Fund A generated investment profits of $250,000. As a result, the NAV for the units increased to $1,250 per unit. Despite the fact that Fund A retained the investment profits and did not distribute them to X, X was required to report the $250,000 of Fund profits on his personal tax return for 2004. In 2005, Fund A generated another $250,000 in investment profits, with the same tax consequences to X. Therefore, on 01/01/06, the NAV was $1,500/unit, and X had reported a total of $500,000 on the personal tax return. Consequently, when X elected to redeem $1,000,000 of units, he was required to redeem only 666.66 units. With respect to those units, X paid $666,660 initially, as well as the tax on the $500 of increased NAV/unit generated from the investment activity.

### III. The Cases Relied Upon by the Receiver Do Not Support the Methodology

The cases cited by the Temporary Receiver are based upon facts which are simply not present here. There is no "Ponzi scheme," no illusory profits or sham transactions, no difficulty whatsoever in determining the ownership interests of each limited partner, and absolutely no impediment to supporting the historic investment activity (profits and losses) of the Raleigh Fund.

In CFTC v. Topworth International, 205 F.3d 1107 (9th Cir. 2000), Advani objected to the the pro rata net investment methodology of reimbursement. The court overruled Advani's objection because there were no company records and hence, it would be difficult to determine the net ending balance in the customers' accounts. The court also concluded that the local rules of the Central District of California required the district court to apply the net investment methodology for "bucketed contracts." Here, no local rules require this approach. Finally, and we believe most importantly, the court concluded that the lack of customer records was "consistent" with the notion that the company "took into its own account the other side of the trade[s] without ever actually executing the order[s]." This is an allegations that the entire corporation's operation was a fraud, and hence akin to a ponzi scheme.

CFTC v. Hoffberg, 93 C 3106, 1993 WL 441984 (N.D. Ill. Oct. 28, 1993) approved one net investment formula over another in an action where the defendant had claimed that there were trading profits when there were, in fact, trading losses and where the defendant was required to be but was not licensed by the CFTC. Again, this is akin to the entire operation being a fraudulent scheme. Similarly, in CFTC v. Equity Financial Group, Civ. No. 4-1512, 2005 U.S. Dist. LEXIS 20001 *18 (D. N.J. September 2, 2005) utilized the net investment

method because "Tech Traders ran a classic Ponzi scheme operation and there is no evidence of profitable economic activity undertaken by Tech Traders."

In re Young, 294 F. 1 (4th Cir. 1923) held that in a bankruptcy proceeding where the bankrupt had caused all investors to invest in a "blind pool" for investing securities, and each customer was shown to have huge fake profits, equity "requires" that the fictive profits be disregarded and that investors who had not recouped what they had paid in, be paid first.

Similarly, In re Madoff, 424 B.R. 122, 140 (S.D.N.Y. 2010), In re Tedlock Cattle, 552 F.2d 1351, 1353 (9th Cir. 1977) and Cunningham v. Brown, 265 U.S. 1 (1924) disregarded fictive profits in determining the amount of distribution each investor should receive from the remaining funds. Here, there are no fictive profits and the entirety of the business was not a fraud scheme as was the case in Topworth International, Hoffberg, In re Young In re Madoff, In re Tedlock Cattle and Cunningham . Indeed, we believe that only because the entirety of the operation was a fraudulent scheme was the implementation of the net investment formula proper. Otherwise, investors would have impermissibly had their property taken from them to satisfy the claims of others. (See infra at Section IV).

The second group of cases relied upon by the Receiver involved situations where a claimant was seeking to recover its entire investment by attempting to trace the claimant's specific investment.

In SEC v. Credit Bancorp Ltd., 290 F.3d 80, 89-90 (2nd Cir. 2002), SECO sought the return of identifiable assets. ("The cases relied upon by SECO that involved Ponzi schemes and sought the return of identifiable assets to particular victims are distinguishable. In those cases the reasons the assets were returned was not merely because they were traceable but because the assets had somehow been segregated and/or never placed in the defrauder's control.") Here,

Hamilton Sr. is not seeking the recovery of specific assets, and is only seeking a ratable recovery.

United States v. Vanguard Investment Co., 6 F.3d 222, 226 (4th Cir. 1993) held that a court could prohibit a customer from proceeding with a claim for rescission when to allow the claim to proceed would interfere with a receivership. Similarly, SEC v. Elliott, 953 F.2d 1560, 1569-70 (11th Cir. 1992) rejected an investor an investor's claim for rescission that was based on a theory that it could trace its assets.

## IV. The Receiver's Proposed Scheme Violates the Taking's Clause

> An Act of Legislation (for I cannot call it a law) contrary to the great first principles of the social compact, cannot be considered a rightful exercise of legislative authority . . . .
> A few instances will suffice to explain what I mean . . . . A law that takes property from A and gives it to B: It is against all reason and justice for a people to entrust Legislature with SUCH powers. Calder v. Bull, 3 Dall. 386, 388 (1798).

See also Kelo v. London, 545 U.S. 469 (2005). Accordingly, Hamilton Sr. is entitled to share pro-rata in the upcoming distribution along with Raleigh's other partners. Hamilton Sr. cannot be prevented from recovering because he had previously redeemed some of his shares in Raleigh at a profit.

A court or receiver should not dispossess Hamilton Sr. of his right to his pro-rata share of the $1.0 million distribution by claiming that it is acting pursuant to its equitable powers on the basis presented by the Temporary Receiver. "The jurisdictional limits to the district court's power in equity receivership proceedings are issues of law, reviewed de novo." SEC v. Vescor Capital Corp., 599 F.3d 1189, 1193 (10th Cir. 2010). The equitable powers conferred upon the judiciary by the Judiciary Act of 1789 "did not include the powers to create remedies previously unknown to equity jurisprudence." Grupo Mexicano de Desarrollo S.A. v. Alliance Bond, 527 U.S. 308, 322 (1999). Obviously, these equitable powers do not include the power to reallocate

Hamilton Sr.'s units in Raleigh to partners who did not redeem some of their units, as he did. The takings clause prohibits the redistribution sought by the Receiver.

## V. The Proposed Alternative Methodology Is Consistent, Equitable and Sensible

"Pro rata distributions are the most fair and most favored in receivership cases." SEC v. Byers, 637 F.Supp. 2d 166, 176 (S.D.N.Y., 2009). Byers was a "massive ponzi scheme" where the net investment methodology was used. The proposal by the Temporary Receiver seeks to utilize the net investment methodology for a "pro rata" distribution which excludes 35% of the partnership interests from participation, and does so without the "ponzi scheme" or other supporting factual context.

Hamilton, Sr. proposes a pro rata distribution based upon the units of limited partnership interest owned by each limited partner. No partner (except a Defendant) is excluded. Each limited partner would receive that dollar amount of the $1,000,000 distribution that is equal to his or her percentage ownership of the issued and outstanding units of limited partnership interest. This methodology recognizes that each outstanding unit has the same rights and carries the same obligations as provided in the limited partnership agreement. It is entirely consistent with the terms of the limited partnership agreement. It does not penalize or reward an individual determination concerning the prior exercise of a right of redemption. It completely accounts for the fact that the Raleigh Fund generated investment returns during its several decades of operation, and that those returns were not sham or illusory. It eliminates any reliance on the fictitious concept that the Raleigh Fund was a "ponzi scheme." It recognizes that the financial harm alleged in the CFTC Complaint was inflicted pro rata on each limited partner in proportion to their respective ownership interests. In sum, the proposed methodology is equitable and sensible.

The specific application of the proposed pro rata distribution methodology is contained in Exhibit 3, which also provides the corresponding distribution amount for each claim under the scheme proposed by the Temporary Receiver. Exhibit 4 documents that under the scheme of the Temporary Receiver, limited partners, including Hamilton, Sr. owning an aggregate of 35.80% of the Raleigh Fund, would receive none of the distribution of $1,000,000 of the assets of the Raleigh Fund. Exhibit 5 documents that under the scheme of the Temporary Receiver, limited partners owning 27.34% of the Raleigh Fund would receive 60.93% of those assets. Plainly, the methodology of the Temporary Receiver creates at least two different classes of limited partners. It does so without a sensible, equitable basis, in contravention of the governing document, and without recognizing the actual operating history of the Raleigh Fund.

## CONCLUSION

Based on the foregoing, Hamilton, Sr. requests that the Court reject the distribution scheme proposed by the Temporary Receiver, and utilize the alternative scheme for pro rata distribution as calculated on Exhibit 3.

Respectfully submitted,

___s/ Peter B. Shaeffer_____

___s/ Stephen Scallan_____

Peter B. Shaeffer, Attorney
30 N. LaSalle Street - Ste. 2140
Chicago, IL 60602
Tel: 312-782-5306
Fax: 312-201-4559

Stephen Scallan
Staes & Scallan
111 W. Washington Street - Ste. 1631
Chicago, IL 60602
Tel: 312-201-8969; Fax: 312-201-9233

## Certificate of Service

The undersigned hereby states that a copy of the foregoing OBJECTION OF RICHMOND HAMILTON, SR. TO THE TEMPORARY RECEIVER'S PROPOSED DISTRIBUTION SCHEME AND PLAN OF INTERIM DISTRIBUTION was served on the following this 8th day of November, 2010 via this court's ECF system.

Joseph A. Konizeski   (Email:
Commodity Futures Trading Commission
525 W. Monroe, Suite 1100
Chicago, IL 60660

Deborah L. Thorne
Kevin C. Driscoll, Jr.
Barnes & Thornburg LLP
1 North Wacker Drive, Suite 4400
Chicago, IL  60606

Michael J. Kralovec
Joseph R. Lemersal
Sara R. McClain
Kralovec Meenan LLP
53 W. Jackson Blvd., Suite 1102
Chicago, IL  60604

Dianne E. Rist
Chapman & Cutler
111 West Monroe, Suite 1600
Chicago, IL  60603

AUSA
United States Attorney's Office (NDIL)
219 South Dearborn Street, Suite 500
Chicago, IL  60604

                              s/ Peter B. Shaeffer